UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIAN TAJBAKHSH<br>400 West 119th Street<br>New York, NY 10027;<br><br>FARIDEH GUERAMY<br>555 Lenox Avenue<br>New York, NY 10037;<br><br>CYRUS TAJBAKHSH<br>9680 East Peak View Rd<br>Scottsdale AZ 85262<br><br>and<br><br>FARIDEH MOHAJER<br>9680 East Peak View Rd<br>Scottsdale AZ 85262<br><br>            Plaintiffs,<br>    v.<br><br>THE GOVERNMENT OF THE<br>ISLAMIC REPUBLIC OF IRAN,<br>Its Ministries, Agencies, and<br>Instrumentalities<br>c/o Ministry of Foreign Affairs<br>Khomeini Avenue<br>United Nations Street<br>Tehran, Iran,<br><br>            Defendants. | **JURY DEMAND**<br><br>**Case No.: 20-1592** |

## **COMPLAINT**

Plaintiffs Kian Tajbakhsh, Farideh Gueramy, Cyrus Tajbakhsh and Farideh Mohajer complain of the actions of the Defendant, The Government of the Islamic Republic of Iran, its Ministries, Agencies, and Instrumentalities, and state in support thereof as follows:

1

**PARTIES**

1. Plaintiff Kian Tajbakhsh ("Dr. Tajbakhsh") is a U.S. citizen and a resident of New York. Dr. Tajbakhsh was falsely imprisoned, tortured, and held hostage on two occasions for a total of 2,515 days (over 6 and a half years) by Defendant the Government of the Islamic Republic of Iran, its Ministries, and Instrumentalities ("Iran").

2. Plaintiff Farideh Gueramy ("Ms. Gueramy") is a U.S. citizen and a resident of New York. She is Dr. Tajbakhsh's mother.

3. Plaintiff Cyrus Tajbakhsh ("Mr. Tajbakhsh") is a U.S. citizen and a resident of Arizona. He is Dr. Tajbakhsh's father.

4. Plaintiff Farideh Mohajer ("Ms. Mohajer") is a U.S. citizen and a resident of Arizona. She is Dr. Tajbakhsh's step-mother and married Mr. Tajbakhsh in 1987.

5. Iran is a foreign sovereign that has been designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App § 2405(j)), both at the time of the matters at issue in this Complaint and at the time this Complaint was filed. Its activities as complained of herein were outside the scope of immunity provided by the Foreign Sovereign Immunities Act ("FSIA"), including 28 U.S.C. § 1605A.

**JURISDICTION**

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330 and 1331, and pursuant to the FSIA, 28 U.S.C. §1605A.

2. Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4).

3. Dr. Tajbakhsh was domiciled in the State of New York at the time of his confinement and torture.

**STATEMENT OF FACTS**

4. Dr. Tajbakhsh was born in Tehran, Iran in 1962. When he was eight years old, he moved to England. In October 1984, he moved to the United States and became a naturalized U.S. citizen on January 11, 1989.

5. Dr. Tajbakhsh received a BA from Imperial College London in 1983, his MSc from University College London in 1984, and his PhD from Columbia University in 1993.

6. From 1994 until 2001, Dr. Tajbakhsh was a professor at the Milano Graduate School of The New School for Social Research ("The New School") in New York City teaching Urban Policy and Planning.

7. In 1999, Dr. Tajbakhsh began working on consulting projects involving urban planning with the Open Society Institute ("OSI"). In fall of 2001, Dr. Tajbakhsh moved to Iran and took a two-year sabbatical while continuing to be employed by The New School. From 2002-2007, Dr. Tajbakhsh also worked as a consultant for the World Bank.

8. In 2004, Dr. Tajbakhsh was offered a full-time position working for the OSI as their representative in Iran. Prior to taking this position, Dr. Tajbakhsh had several meetings with Iran's representative to the United Nations, Mohammad Javad Zarif, about the projects that OSI intended to do in Iran including support to Iranian public health and HIV programs. Mr. Zarif approved and signed off on all these projects. With this assurance, Dr. Tajbakhsh began working for the OSI as their representative in Iran.

9. After working in Iran for about six years, Dr. Tajbakhsh was arrested on May 11, 2007, at his home by several armed men on behalf of the Iranian government. The men searched his apartment and confiscated computers, cell phones, books, and documents. Dr. Tajbakhsh was taken to Evin Prison in Tehran and was held in solitary confinement for over four months, 132 days, before being released on September 19, 2007.

10. Evin Prison is notoriously one of the most brutal and ruthless prisons in the world. Upon entering, he was forced to strip and change into prison pajamas. He was given two thin blankets, one of which he used to sleep on and the other to roll up to make a pillow.

11. Dr. Tajbakhsh's solitary confinement cell measured approximately nine feet in length and six feet in width. A bright light was kept on 24 hours a day, making it difficult to sleep. The cell was infested with bugs and Dr. Tajbakhsh would sometimes see rats. A thin filthy carpeting covered the floor. There was no bed or toilet in the cell.

12. After about a week, he was transferred to a different cell. This cell was identical to the first, except it had a toilet – which was merely a hole in the floor. Directly above the hole was a showerhead, so he had to straddle the toilet in order to shower.

13. Both cells were located within Ward 209 of Evin Prison. Ward 209 houses political prisoners and is run by Iran's Ministry of Intelligence and Security ("MOIS").

14. For approximately the first three months of his imprisonment, Dr. Tajbakhsh was interrogated every day. Each morning he was blindfolded in his cell and brought to an interrogation room. He was forced to sit facing a wall before he was allowed to remove his blindfold. The interrogations lasted the entire day with only two short breaks for meals.

15. Dr. Tajbakhsh had two interrogators. He was never permitted to look at one of the interrogators who sat behind him while he faced the wall. Dr. Tajbakhsh was accused of spying

on behalf of the United States government and working for the CIA. Dr. Tajbakhsh has never held a position in the United States government or worked for the CIA and denied the charges.

16. Other than his interrogations, he had virtually no human contact for the entirely of his 132 days in confinement. During his interrogations, Dr. Tajbakhsh suffered extreme and continuous psychological and physical torture. He was threatened, intimidated, and humiliated, all in an attempt to get him to confess information he did not know and to confess to crimes that he did not commit. Some of his interrogations were also videotaped.

17. From the beginning of his detainment, guards and his interrogators forced Dr. Tajbakhsh to take white and yellow pills for "anxiety." The pills made him feel abnormal, lethargic, and detached from the world. Since the detachment felt better than his current reality in prison, he quickly became addicted to the pills. This became another form of control for his captors who would refuse to give the drugs to Dr. Tajbakhsh in an effort to coerce him into cooperating.

18. At some point during his detention, Dr. Tajbakhsh had an extreme panic attack. He was taken to a clinic inside the prison and saw a doctor. The doctor said that he was going to give Dr. Tajbakhsh an injection to help with his anxiety. Dr. Tajbakhsh believed that the injection was going to be administered as a means to kill him and fought against it. After a long bout of fighting and screaming, the doctor eventually administered the injection.

19. Dr. Tajbakhsh thought that his life was over but instead woke up the next day in his solitary confinement cell. He awoke feeling ashamed and guilty because his screaming had most likely terrified any of the prisoners who had heard him.

20. Dr. Tajbakhsh constantly asked his interrogators for an attorney but was told that he was not allowed one. He was never brought to trial during his 2007 imprisonment.

21. After approximately three months of daily interrogations, he began being interrogated about three times a week. During this time, he was also allowed out of his cell for a half hour each day to walk – sometimes in a small room, other times he was permitted to go out into a small yard or terrace.

22. On September 19, 2007, at approximately two in the morning, Dr. Tajbakhsh was being interrogated. Suddenly, without any explanation, he was told that he would be released on condition that he discontinued his work with the OSI and did not leave Iran. He was taken to the prosecutor's office where a prosecutor signed off on his bail. His bail was set at 800 million tomans, or approximately $800,000. His wife scraped together collateral for bail, and he was released.

23. Upon his release, Dr. Tajbakhsh immediately discontinued working for the OSI and took a year sabbatical to weigh his options. His interrogator continued to communicate and check in with him.

24. In February 2009, Dr. Tajbakhsh was afforded the opportunity to interview for a professorship at two universities in the United States, one of which was Columbia University. Dr. Tajbakhsh asked his interrogator permission to leave Iran for the in-person interviews. He was told that he could leave the country but that his wife and daughter had to stay in Iran.

25. Dr. Tajbakhsh was offered the professorship at Columbia University and was scheduled to begin teaching urban planning in August or September 2009. He began planning with his family to move out of Iran. He discussed these plans with his interrogator who assured Dr. Tajbakhsh that they would be allowed to leave the country.

26. On July 9, 2009, there was a knock at the door of Dr. Tajbakhsh's house at approximately eight o'clock at night. As soon as Dr. Tajbakhsh cracked the door open, about ten

6

men crashed through the door and handcuffed him. One of the men pointed a gun to his head as his wife and two-year old daughter looked on. The men said that they were the National Police, a branch of the Islamic Revolutionary Guard Corps ("IRGC").

27. Again, his house was searched and ransacked. The men took papers, books, computers, and phones. Dr. Tajbakhsh was taken outside to a Peugeot 405 automobile and driven away. As they neared the entrance of Evin Prison, he was blindfolded. No one knew his whereabouts for the next ten days.

28. From the vehicle, Dr. Tajbakhsh was taken to an interrogation room on the second floor of Evin prison. They took his blindfold off and there was a video camera pointed at him and a large curtain. There were interrogators on the other side of the curtain so Dr. Tajbakhsh could not see them. He was asked about various information regarding the Green Movement in Iran, which he did not know of other than what he had read in newspapers. He was accused of being a United States spy and working with the Green movement to overthrow the Iranian government. Since he was not working for the United States, or the Green Movement, and was in no way trying to overthrow the Iranian government, he denied these charges.

29. After the interrogation, Dr. Tajbakhsh was placed in solitary confinement in Ward 2A of Evin Prison. The cell was similar to his cells in 2007. After the door slammed shut, he immediately had an extreme panic attack. He had difficulty breathing and did not sleep at all that night. He was held in solitary confinement for the next five months.

30. During those months, Dr. Tajbakhsh was interrogated daily with only two breaks for small meals. Pills were given to him frequently, the same ones as when he was detained in 2007, and he quickly became addicted again.

31. The day after his arrest, Dr. Tajbakhsh was blindfolded and led down a long pathway and at one point had to walk on a plank to cross between two buildings. He was then led downstairs to a large room, filled with chains and metal rings on the floors and walls. The threat of violence surrounded him. He was then forced to sit on a chair facing the wall.

32. He had two new interrogators who operated in the same manner as in 2007. Dr. Tajbakhsh was permitted to look at one of them and the other loomed behind him. The interrogation began with one of his interrogators saying, "You will not leave until I am satisfied," and that Dr. Tajbakhsh had, "committed the crime of treason and will have to pay for it." Dr. Tajbakhsh could see from their questioning that the Iranian government wanted to brand him as the linchpin between the Green Movement, the Open Society Institute, and the United States government in a conspiracy to overthrow the Iranian government.

33. Dr. Tajbakhsh asked continually for a lawyer but was told that he was not allowed one. After a few months his family was able to hire a lawyer, but it made little difference. Dr. Tajbakhsh was only allowed to meet with his attorney one time prior to his trial. During the meeting in Evin prison, one of his interrogators sat directly next to his attorney the entire time. His attorney was not even allowed inside the courtroom during Dr. Tajbakhsh's trial.

34. On August 1, 2009, a massive show trial began for over 100 people, including Dr. Tajbakhsh. It was filmed live on Iranian television and lasted several days. The judge was Abolqasem Salavati who is known as "Iran's Hanging Judge" and "The Judge of Death" due to the vast number of prisoners he has sent to the gallows.

35. On October 18, 2009, a terrorist bomb killed 42 Iranians, including six Revolutionary Guard officials. Iran publicly blamed the United States and the CIA. On the same day, Judge Salavati convicted Dr. Tajbakhsh as an American Spy and sentenced him to 15 years

in prison. Immediately thereafter, Iran threatened Dr. Tajbakhsh with additional spy charges which would carry the death penalty.

36. On November 23, 2009, the White House issued a second official statement about Dr. Tajbakhsh's case amid alarm from European diplomats that Dr. Tajbakhsh's execution was imminent and that Iran was determined to carry out a public execution of an 'American Spy' on the one-year anniversary of Green Movement martyr Neda Agha-Soltan's death in order to divert attention from the inevitable protests that would surround the anniversary.

37. On December 23, 2009, Dr. Tajbakhsh was moved out of solitary into a group cell which housed other political prisoners, including former speakers of Iranian Parliament, former Deputy Minister of Interior, Mostafa Tajzadeh, and former vice-president, Mohammed Ali Abtahi.

38. Dr. Tajbakhsh's attorney appealed his conviction and on February 7, 2010, and his sentence was reduced to five years. However, his interrogators constantly reminded him that they had ways to keep him forever if he did not cooperate and answer their questions.

39. Around this time, after a week or two in the group cell, Dr. Tajbakhsh was moved to a different solitary confinement cell. This one was like his previous solitary confinement cells, except no light was kept on 24 hours. Instead, the cell was at the end of a large cell block that housed no other prisoners and was kept in complete darkness – it was so dark that he could not see his hand in front of his face. There was absolute silence in this wing of the prison so any slight sound would frighten and gnaw at him. At times he had thought he had died because of the sheer emptiness.

40. Dr. Tajbakhsh was housed in this section of the prison for about two months before returning to the group cell. He stayed there for a couple of weeks until he was taken to the

chief prosecutor of Tehran with an IRGC liaison on March 13, 2010. He was told that the Revolutionary Court was going to give him a temporary furlough and that he would be released to his house as long as he promised that he would take part in no political activity and be ready to do whatever his interrogator told him to do.

41. Dr. Tajbakhsh agreed and bail was set at 1 billion tomans, or approximately 1 million dollars. With some help from his family, Dr. Tajbakhsh made bail and returned home.

42. In March 2010, Iran put Dr. Tajbakhsh on "temporary furlough" with the restrictions that he was not permitted to work, publish articles, or travel outside the country. During this time, he was under Iran's complete control and authority. He was taken every day to an undisclosed location, for about eight hours where he was under watch by an armed guard. He was under complete surveillance and continued to be interrogated during this time. One of his interrogators constantly reminded him that, "You will not drink a glass of water without us knowing." This went on for nearly six years, while Iran continued to negotiate his release with the United States through various channels.

43. On January 16, 2016, the United States exchanged seven Iranian prisoners and 1.7 billion dollars for five imprisoned Americans imprisoned in Iran, including Dr. Tajbakhsh.

44. Dr. Tajbakhsh's confinement caused him severe and extreme psychological distress, both during his imprisonment and after his release. Since returning to the United States, Dr. Tajbakhsh has suffered post-traumatic stress disorder and other lasting psychological damage from his captivity and torture.

45. Dr. Tajbakhsh's financial situation has also suffered as a result of his detention in Iran due to his sheer absence and inability to work.

46. The above also took a heavy toll on Ms. Gueramy, Mr. Tajbakhsh and Ms. Mohajer, both during Dr. Tajbakhsh's imprisonment and after his release. They have suffered post-traumatic stress disorder and other lasting psychological damage due to Dr. Tajbakhsh's captivity and torture.

## COUNT I

### (PERSONAL INJURIES CAUSED BY TORTURE AND HOSTAGE-TAKING: 28 U.S.C. § 1605A)

47. Paragraphs 1 through 46 above are incorporated as if set forth herein at length.

48. Dr. Tajbakhsh was a citizen of the United States when arrested and held unlawfully by Iran. While being held, Dr. Tajbakhsh was physically and psychologically tortured as described herein.

49. Anti-terrorism provisions codified at 28 U.S.C. § 1605A(a) establish a federal right of action against Iran for committing acts of hostage-taking and torture.

50. Section 1605A provides four elements for a claim against a foreign state, all of which are met here:

   a. That defendant be designated as a state sponsor of terrorism;

   b. That claimant be a national of the United States;

   c. That the foreign country must be given reasonable opportunity to arbitrate that claim if the conduct took place of foreign soil; and

   d. That the act alleged to be caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ."

51. Iran was designated a state sponsor of terrorism by the Secretary of State on January 19, 1984. *See* 49 Fed. Reg. 2836 (Jan. 23, 1984).

52. Dr. Tajbakhsh was a citizen of the United States at the time of his imprisonment and torture.

53. The definition of "torture" under FSIA, derived from § 3 of the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), codified at 28 U.S.C. § 1350 (note), includes

> Any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person is committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

54. While Dr. Tajbakhsh was in Iran's custody and control, Iran intentionally subjected Dr. Tajbakhsh to 2,515 days of severe pain and suffering, including solitary confinement, physical and mental abuse, and threats against his life, all with the intent to obtain a false confession and coerce his cooperation. Iran's conduct constitutes torture as defined under FSIA.

55. "Hostage-taking" under FSIA, as derived from Article 1 of the United Nations International Convention Against the Taking of Hostages, No. 21931 (Nov. 1, 1979), is defined as follows:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the

hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention.

56. Iran detained Dr. Tajbakhsh on false charges and threatened to kill, injure, and continue to detain Dr. Tajbakhsh for 2,515 days in an attempt to win money or other concessions from the United States. Iran's conduct was hostage-taking as defined under FSIA.

57. A foreign state is held vicariously liable for the acts of its officials, employees, or agents. 28 U.S.C. § 1605A(c)(4).

58. Dr. Tajbakhsh continues to suffer physical and psychological harm to this day as a result of his hostage-taking and torture by Iran.

## COUNT II

### (§ 1605A(c) CAUSE OF ACTION – ASSAULT AND BATTERY)

59. Paragraphs 1 through 58 above are incorporated as if set forth herein at length.

60. Iran committed or is responsible for numerous acts of assault and battery upon Dr. Tajbakhsh during his confinement and torture.

61. Under the FSIA, a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

62. Iran is stripped of its immunity under the FSIA because of its acts of hostage-taking and torture, and is therefore liable for torts in the same manner and to the same extent as a private individual.

63. Iran applied force to the person of Dr. Tajbakhsh and took actions reasonably tending to create the apprehension of Dr. Tajbakhsh that it was about to apply such force to him. Iran also intended harmful or offensive contact with Dr. Tajbakhsh without his consent. Iran's

conduct included intentionally and repeatedly threatening Dr. Tajbakhsh's life, threatening bodily injury, and physically attacking Dr. Tajbakhsh.

## COUNT III

### (§ 1605A(c) CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

64. Paragraphs 1 through 63 above are incorporated as if set forth herein at length.

65. Iran's use of solitary confinement, sleep deprivation, threats of physical abuse, threats of execution, and restrictions of Dr. Tajbakhsh's contact with his family and attorney was intentional and reckless, extreme and outrageous, and caused Dr. Tajbakhsh severe emotional distress.

66. Iran's treatment of Dr. Tajbakhsh violated acceptable norms of treatment under both U.S. and international law, and was therefore extreme and outrageous.

67. Iran's actions left Dr. Tajbakhsh severely emotionally and psychologically damaged.

## COUNT IV

### (§ 1605A(c) CAUSE OF ACTION – FALSE IMPRISONMENT)

68. Paragraphs 1 through 67 above are incorporated as if set forth herein at length.

69. Dr. Tajbakhsh was deprived of liberty without cause and without legal justification. Iran held Dr. Tajbakhsh despite knowledge that they had no basis to do so.

## COUNT V

### (§ 1605A(c) CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/LOSS OF SOLATIUM)

70. Paragraphs 1 through 69 above are incorporated as if set forth herein at length.

71. 28 U.S.C. §§ 1605A(c) creates a cause of action against Iran for its participation in and support of the hostage taking and torture of Dr. Tajbakhsh.

72. As a direct and proximate consequence of Iran's actions, the plaintiffs have suffered economic damages, including, inter alia, loss of accretions and loss of assistance, for which they are entitled to compensation pursuant to 28 U.S.C. § 1605A(c).

73. As a further direct and proximate result of the hostage taking and torture of Dr. Tajbakhsh, Ms. Gueramy, Mr. Tajbakhsh and Ms. Mohajer have suffered extreme loss of solatium, entitling them to compensatory damages pursuant to 28 U.S.C. § 1605A(c).

74. The conduct of Iran, acting in concert to carry out their unlawful objectives, was outrageous, malicious, in willful, wanton and reckless disregard of the rights of the plaintiffs. As such, the plaintiffs are entitled to punitive damages against Iran.

## PRAYER FOR RELIEF

1. As a result of the personal injuries he has suffered due to the acts of torture and hostage-taking, Dr. Tajbakhsh is entitled to economic damages and compensatory damages for pain and suffering, all of which are recoverable under the FSIA. 28 U.S.C. § 1605A.

2. As a result of the personal injuries Dr. Tajbakhsh has suffered due to the acts of torture and hostage-taking, Ms. Gueramy, Mr. Tajbakhsh and Ms. Mohajer are entitled to economic damages and compensatory damages for loss of solatium, all of which are recoverable under federal and/or state law.

3. In addition to all appropriate compensatory damages, plaintiffs are entitled to punitive damages because Iran's acts were intentional, malicious, and performed deliberately to injure, damage, and harm Dr. Tajbakhsh and his family.

4. Plaintiffs further seek costs, attorney's fees, and such other relief as may be just and proper, including pre-judgment interest.

Dated: June 17, 2020

Respectfully submitted,

/s/ Christopher M. Seleski
Christopher M. Seleski (D.C. Bar #NJ017)
Tolmage, Peskin, Harris & Falick
20 Vesey Street
Suite 700
New York, NY 10007
Tel: (212) 964-1390
Fax: (212) 608-1390
seleski@tolmagepeskinlaw.com

*Counsel for Plaintiffs*
