## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIAN TAJBAKHSH *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 20-cv-1592-ACR-MAU |
| GOVERNMENT OF ISLAMIC REPUBLIC OF IRAN *et al.*, | |
| *Defendants*. | |

## REPORT AND RECOMMENDATION

Plaintiffs Kian Tajbakhsh ("Kian"), Farideh Gueramy ("Farideh G."), Cyrus Tajbakhsh ("Cyrus"), and Farideh Mohajer ("Farideh M.") (collectively "Plaintiffs") bring this action under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"). *See* 28 U.S.C. § 1605A; ECF No. 1. Plaintiffs seek to hold the Government of the Islamic Republic of Iran ("Iran")[1] liable for its alleged acts of torture and hostage taking against Kian. ECF No. 1. Plaintiffs allege that Iran imprisoned Kian for hundreds of days in 2007, 2009, and 2010. *Id.* ¶¶ 9, 26, 42. Plaintiffs also allege that Iran held Kian on furlough in his home from 2010 to 2016. *Id.* ¶¶ 42–43. Plaintiffs move for default judgment because Iran has failed to appear in this case. ECF No. 27-3. The District Court referred Plaintiffs' Motion for Default Judgment ("Motion") to this Court for a Report and Recommendation. Min. Order (Aug. 21, 2023). For the following reasons,

---

[1] Plaintiffs have also named as a defendant Iran's "Ministries, Agencies, and Instrumentalities." ECF No. 1. The FSIA defines a "foreign state" to include "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). It further defines an agency or instrumentality to be any entity "which is a separate legal person" and "which is an organ of a foreign state." *Id.* § 1603(b). Because Plaintiffs do not make any specific claims against those "Ministries, Agencies, and Instrumentalities" that it does not make against Iran, Iran is clearly the real party in interest in this case. Accordingly, the Court addresses Plaintiffs' claims as ones against the Government of Iran only.

this Court recommends that Plaintiffs' Motion be **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND

The Court makes the following findings of fact based on the record evidence.

### Plaintiffs

Kian Tajbakhsh is a dual citizen of the United States and Iran. Decl. of Kian Tajbakhsh ¶¶ 1, 5, ECF No. 27-5. Kian was born in Tehran in 1962 and lived there until he was eight years old. *Id.* ¶¶ 1–2. At that time, his parents separated. *Id.* He attended boarding school in England and alternated holidays visiting his mother in New York and his father in Tehran. *Id.* ¶ 2. He obtained degrees from universities in England and the United States and ultimately earned a Ph.D. in Urban Planning from Columbia University. *Id.* ¶¶ 3–4, 6. On January 11, 1989, Kian became a naturalized U.S. citizen. *Id.* ¶ 5; *see also id.* at 16.[2]

Farideh Gueramy is Kian's mother. Decl. of Farideh Gueramy ¶ 1, ECF No. 27-8. She was born in Tehran and became a U.S. citizen in 1974. *Id.* Cyrus Tajbakhsh is Kian's father. Decl. of Cyrus Tajbakhsh ¶ 1, ECF No. 27-9. He was born in Tehran and became a U.S. citizen on September 24, 2007. *Id.* ¶¶ 1–2. Farideh Mohajer is Kian's stepmother. Decl. of Farideh Mohajer ¶ 1, ECF No. 27-10. She was born in Tehran and became a U.S. citizen in 1987. *Id.* She married Cyrus in 1988 when Kian was twenty-six years old. *Id.* ¶ 4.

Kian has worked in urban planning and policymaking as a college professor, independent consultant, and advisor. ECF No. 27-5 ¶¶ 7–10. He previously served as an advisor to the Open Society Institute ("OSI"), where he studied Iran's local government sector. *Id.* ¶¶ 8–9. In 2001, Kian moved to Iran to work full-time for OSI. ECF No. 27-4 at 13; *see* ECF No. 27-9 ¶ 14. As Kian has attested, the OSI projects were both apolitical and approved by the Iranian government.

---

[2]    Citations are to the page numbers in the ECF headers.

ECF No. 27-5 ¶ 10; *see also* Expert Report of Dr. Mehdi Khalaji ¶¶ 28–29, ECF No. 27-7 (citing Columbia University professors' letter to Secretary Clinton asserting that there was "nothing political about [Kian's] work" (citation omitted)).

### First Arrest and Imprisonment (2007)

Kian was first arrested when he was living with his pregnant wife in Tehran. ECF No. 27-5 ¶ 11. On May 11, 2007, eight or nine Islamic Revolutionary Guard Corps ("Revolutionary Guard") agents barged into Kian's house. *Id.* The agents searched the house and confiscated computers, phones, books, and papers. *Id.* ¶ 12. While holding the couple at gunpoint, the agents showed the couple a blank paper and called it an "arrest order." *Id.* ¶ 11. The agents then took the couple to Evin Prison and separated them. *Id.* ¶ 13. ████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ Kian learned weeks later that officials had released his wife a week after the arrest. *Id.* ¶ 17.

Kian stayed in solitary confinement. The cell was no bigger than six-by-nine feet. *Id.* ¶ 14. As he described, "The room smelled putrid and the concrete floors were extremely dirty. There were no windows and no toilet. A bright light stayed on 24 hours a day." *Id.*

Kian was subjected to daily interrogations. *Id.* ¶¶ 16, 19. Officials wanted Kian to confess that he was an American spy who sought to overthrow the Iranian government. *Id.* ¶ 16. They constantly punished and threatened him with life imprisonment or execution. *Id.* ¶¶ 16, 19. ████ ████████████████████████████████████████████████

---

[3]    Kian often does not specify the roles or titles of the individuals who engaged in the acts taken against him. To the extent an individual's specific role is unclear but it is clear that person is working on behalf of Iran, the Court generally refers to that individual as a "government official" or "official."

███████████████████████████████████████████

███████████████████████████████

On September 19, 2007, officials released Kian from prison and ordered him to stop working for OSI. *Id.* ¶ 22. Kian complied and, for the next two years, he focused only on academic research and writing. *Id.* ¶ 23.

### Second Arrest and Imprisonment (2009–2010)

On July 9, 2009, nine to ten agents who claimed to be the "National Police" broke into Kian's apartment. *Id.* ¶¶ 27–28. The National Police is an emergency branch of the Iranian government tasked with handling the political movement called the "Green Movement." *Id.* ¶ 28. Just as before, the agents confiscated property from Kian's home. *Id.* The agents then took Kian to Evin Prison, ███████████████████████████

That same day, officials brought Kian to an interrogation room. *Id.* ¶ 30. The interrogator questioned Kian about his relationships with certain reformist politicians in an attempt to use Kian as a "linchpin to tie together the Green Movement with OSI and the United States." *Id.* ¶¶ 31–33. Just as before, the interrogator asked Kian to confess to being an American spy. *Id.* ¶ 33. And just as before, Kian refused. *Id.* When the interrogation concluded late in the night, officials placed Kian in solitary confinement. *Id.* ¶¶ 34–35.

Kian's living conditions and experiences mirrored those of his first imprisonment. Interrogators questioned him daily about being an American spy and threatened him for committing treason. *Id.* ¶¶ 37–38, 42. During those interrogations, Kian was forced to face a wall of metal chains and rings while being questioned. *Id.* ¶¶ 37–38. Throughout Kian's imprisonment, officials transferred him between solitary confinement and a group cell. *Id.* ¶¶ 35, 48–52. Kian described one solitary confinement cell as "solitary confinement within solitary confinement": the

cell was dark and windowless in a large, vacant section of the prison. *Id.* ¶ 51. The group cell was in a section of Evin Prison that the Revolutionary Guard controlled. *Id.* ¶ 48. The Revolutionary Guard notoriously engaged in widespread and institutionalized torture in the group cell, though Kian has not described any specific incidents. *Id.*

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

Kian was part of two "trials" that officials broadcast on television. On August 1, 2009, prosecutors used Kian as "Exhibit A" for the government's case against other defendants. *Id.* ¶ 40. Although an interrogator had instructed Kian on what to say, Kian entered his own defense. *Id.* The judge, however, ignored Kian's words and told Kian there would be no need for a trial because he faced the death penalty. *Id.* On October 15, 2009, Iran prosecuted Kian as a defendant in a mass trial, and the Iranian court convicted him of two counts of espionage. *Id.* ¶ 41. Although Kian's family had hired a lawyer, Iranian officials barred the lawyer from the courtroom. *Id.* The lawyer also could not meet with Kian privately. *Id.* The court sentenced Kian to fifteen years. *Id.* ¶¶ 44–45.

**Release on Furlough (2010–2016)**

On March 13, 2010, eight months after Kian's arrest, Tehran's chief prosecutor met with Kian and informed him that officials were releasing him on furlough. *Id.* ¶ 53. This meant that Kian could go home, subject to conditions. *Id.* ¶¶ 53–54. Specifically, Kian could not leave his home and was not allowed to work, publish, teach, or take part in any political activities. *Id.* ¶ 54. Kian needed to request permission from interrogators to go anywhere. *Id.* ¶¶ 55–57. Although Kian has described Iranian agents as "interrogators," it is unclear whether Kian endured

interrogations during this time period.  Interrogators required Kian to visit a warehouse at least five days a week, where his activities were restricted.  *Id.* ¶¶ 55–56.  At times, the interrogators forced Kian to conduct research and write reports about non-governmental groups including OSI and to translate various public websites from English to Farsi.  *Id.* ¶ 56.  This routine continued for nearly six years.

On January 16, 2016, an interrogator brought Kian to the passport office and told him that he could leave Iran.  *Id.* ¶ 58.  On January 28, Kian, his wife, and daughter boarded a flight from Iran and to Arizona.  *Id.* ¶ 60.  Kian later learned that his release was part of a prisoner exchange in which the United States released seven Iranian prisoners and paid Iran $1.7 billion.  *Id.* ¶ 61.

**Aftermath**

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████

Kian's family members have described the impacts of Kian's imprisonment.  Cyrus visited Kian in prison and felt extremely disturbed and upset.  ECF No. 27-9 ¶ 23.  Since Kian's imprisonment, Cyrus's doctor has diagnosed Cyrus with high blood pressure.  *Id.* ¶ 24.  Farideh G. testified that she is constantly crying and has "never regained [her] life."  ECF No. 27-8 ¶¶ 17–19.  Farideh M. attested that she "got hooked on sleeping pills" during Kian's detention and now has to take those pills to fall asleep.  ECF No. 27-10 ¶ 11.

## PROCEDURAL HISTORY

Plaintiffs filed this Complaint on June 17, 2020. ECF No. 1. After some difficulty, Plaintiffs served Iran through the State Department and the Embassy of Switzerland. ECF Nos. 18, 22. Iran failed to appear. On August 16, 2022, the Clerk entered default against Iran. ECF No. 25. On December 16, 2022, Plaintiffs moved to file a motion for default judgment under seal. ECF No. 27. Plaintiffs thereafter filed a redacted version of their Motion. ECF No. 30.

## ANALYSIS

### I.     Default Judgment under the FSIA

Plaintiffs seek default judgment against Iran under the FSIA because Iran has failed to defend this lawsuit. Federal Rule of Civil Procedure 55(b)(2) provides district courts with discretion to enter a default judgment upon a party's motion. Fed. R. Civ. P. 55(b)(2). A default judgment is only available against a foreign sovereign if the plaintiff "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Because entry of default judgment is not automatic, the Court has an independent obligation to determine jurisdiction. *See Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (personal jurisdiction); *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1060 (D.C. Cir. 2024) (subject matter jurisdiction). The plaintiff bears the burden of establishing both subject matter and personal jurisdiction. *See Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017) (citations omitted).

The FSIA's flexible evidentiary standard gives the Court broad discretion to determine what kind of evidence is appropriate in any given case. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (noting "the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide"). The Court "must base it findings of fact and conclusions of law upon evidence admissible under the Federal Rules of Evidence." *Owens v. Republic of Sudan*, 864 F.3d 751, 786 (D.C. Cir. 2017),

*vacated and remanded on other grounds sub nom.*, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020) (citing *Han Kim*, 774 F.3d at 1049). Thus, the Court may take uncontroverted factual allegations that are supported by admissible evidence as true. *See Hekmati*, 278 F. Supp. 3d at 157 (citations omitted). A plaintiff may establish proof by affidavit. *See id.* (citations omitted). Further, an evidentiary hearing is not required. *See Mwani*, 417 F.3d at 7. So long as a plaintiff produces evidence that is both admissible and satisfactory to establish jurisdiction and prove the merits of his case, the Court may enter a default judgment against the foreign sovereign. *See Owens*, 864 F.3d at 784.

## II.    Subject Matter Jurisdiction

A court may not exercise jurisdiction over a foreign sovereign unless the case meets one of the exceptions to sovereign immunity in the FSIA. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983); 28 U.S.C. §§ 1330(a), 1604. In this case, Plaintiffs rely on the terrorism exception. ECF No. 27-4 at 31–37; *see* 28 U.S.C. § 1605A. This exception applies when an official, employee, or agent of the foreign state engaged in certain acts that caused personal injury or death. 28 U.S.C. § 1605A(a)(1).

There are several requirements to meet the terrorism exception under Section 1605A. First, Section 1605A(a)(2) sets forth three threshold criteria. *Id.* § 1605A(a)(2). Second, the official, employee, or agent of the foreign state must have been "acting within the scope of his or her office, employment, or agency." *Id.* § 1605A(a)(1). Third, the acts must qualify as "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." *Id.* Plaintiffs argue that Iran engaged in acts of torture and hostage taking. ECF No. 27-4 at 31–37. Upon review of the evidence, Plaintiffs have satisfied their burden.

**A.    Plaintiffs Satisfy the Threshold Criteria to Invoke the Terrorism Exception.**

For this Court to hear Plaintiffs' claims under the terrorism exception, Plaintiffs must satisfy three threshold criteria under Section 1605A(a)(2). They must establish that: 1) Iran "was designated as a state sponsor of terrorism" at the time of the underlying acts; 2) "the claimant or the victim" was a United States national at the time of the underlying acts; and 3) because the acts occurred in Iran, Plaintiffs afforded Iran a reasonable opportunity to arbitrate the case. 28 U.S.C. § 1605A(a)(2)(A). Plaintiffs have satisfied all three requirements. ECF No. 27-4 at 31–32.

*First*, the State Department has continuously designated Iran as a state sponsor of terrorism since 1984. 28 U.S.C. § 1605A(a)(2)(A)(i); *see id.* § 1605A(h)(6) (defining state sponsor of terrorism in reference to State Department designations); Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984); U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism [https://perma.cc/3VLT-DFGC] (last visited August 13, 2025). Kian's imprisonment and furlough occurred between May 2007 and January 2016. *See supra* Factual Background. Iran was, thus, a designated state sponsor of terrorism at the time of the underlying acts.

*Second*, Plaintiffs have shown that "the claimant or the victim" was a United States national during the relevant time period. 28 U.S.C. § 1605A(a)(2)(A)(ii); *id.* § 1605A(h)(5) (defining "national of the United States" in reference to the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(22), which includes citizens; *see generally Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14–15 (D.C. Cir. 2015) (explaining that actions under Section 1605A are limited to U.S. citizens or residents of American Samoa and Swains Island). All Plaintiffs were U.S. citizens during Kian's second imprisonment and house arrest. ECF Nos. 27-5 ¶ 5; 27-8 ¶ 1; 27-9 ¶ 2; 27-10 ¶ 1. Moreover, all Plaintiffs except Cyrus were citizens during Kian's first imprisonment. ECF

Nos. 27-5 ¶ 22 (stating Kian was released from prison on September 19, 2007); 27-9 ¶ 1 (stating Cyrus became a naturalized citizen on September 24, 2007).

The fact that Cyrus was not a citizen during the first imprisonment is not fatal to his claim. The statute states "the claimant *or* the victim" must be a citizen. 28 U.S.C. § 1605A(a)(2)(A)(ii) (emphasis added). As this Circuit has explained, the language of the statute is "clear on its face," and "if either the claimant or the victim is a national of the United States, then immunity is waived." *La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837, 844 (D.C. Cir. 2008) (holding that terrorism exception applies to claims of foreign insurer that was the assignee and subrogee of victims who were U.S. nationals);[4] *see, e.g.*, *Gration v. Islamic Republic of Iran*, No. 21-cv-1859, 2023 WL 5221955, at *23 (D.D.C. Aug. 15, 2023) (allowing non-citizen plaintiff to recover under the FSIA because her claims arose from the injuries of her husband, who was a U.S. citizen). Because Cyrus bases his claim on Kian's injuries, Cyrus is not precluded from recovering under the statute.

*Third*, Plaintiffs afforded Iran a reasonable opportunity to arbitrate. 28 U.S.C. § 1605A(a)(2)(A)(iii). Plaintiffs included an Offer to Arbitrate when they served Iran. ECF No. 31. This Offer is sufficient to meet the requirements of the statute. *See, e.g.*, *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 175–76 (D.D.C. 2019).

### B. An Official, Employee, or Agent of Iran Was Acting Within the Scope of Their Office, Employment, or Agency.

For Iran to face liability, Plaintiffs must show that "an official, employee, or agent of the foreign state, while acting within the scope of his or her office, employment, or agency" committed

---

[4] The Circuit's decision in *La Reunion Aerienne* interpreted materially-identical language under an earlier version of the terrorism exception, 28 U.S.C. § 1605(a)(7). *See Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 570 n.5 (7th Cir. 2012) (applying *La Reunion Aerienne*'s interpretation to current version of statute because current language is clearly similar on its face).

the acts. 28 U.S.C. § 1605A(a)(1). Although Plaintiffs have failed to directly address this requirement, they have submitted some relevant evidence. *See generally* ECF No. 27-4 at 34–37. Additionally, the Court may take judicial notice of facts not subject to reasonable dispute. *See* Fed. R. Evid. 201(b). Courts in this District have frequently taken judicial notice of facts established in earlier, related terrorism exception cases. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 387 (D.D.C. 2015). Plaintiffs' evidence, when combined with judicially-noticed facts, satisfies the Court that the acts committed against Kian were undertaken by Iranian officials acting within the scope of their office.

The record reflects the involvement of at least two types of Iranian officials. First, Kian testified that Revolutionary Guard agents arrested him twice. ECF No. 27-5 ¶¶ 11, 28. As at least one other court has recognized, the Revolutionary Guard is a "branch of Iran's armed forces and is responsible for internal and border security." *Azadeh v. Gov't of Islamic Republic of Iran*, No. 16-cv-1467, 2018 WL 4232913, at *4 (D.D.C. Sep. 5, 2018). Second, Plaintiffs' expert attested that Evin Prison is a state-run facility. *See* ECF No. 27-7 ¶ 26 (explaining Iran incarcerates political prisoners and hostages in Evin Prison). Other courts have also recognized that Iran is responsible for acts in Evin Prison. *See, e.g.*, *Azadeh*, 2018 WL 4232913, at *13 (citing expert testimony that Evin Prison is run and operated by the Iranian government). There is no reasonable dispute—particularly in light of the dearth of conflicting evidence—that Iran is responsible for the acts committed against Kian.

## C.    Iran Waived Sovereign Immunity Through Acts of Torture and Hostage Taking.

Because the first two requirements for the terrorism exception to apply are met, the Court next addresses whether Iran's conduct qualifies as an act of "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28

U.S.C. § 1605A(a)(1).  Plaintiffs claim that Iran engaged in: 1) torture; and 2) hostage taking.  ECF

No. 27-4 at 32–37.

### 1.    Torture

The FSIA incorporates the definition of torture from the Torture Victim Protection Act

("TVPA").  28 U.S.C. § 1605A(h)(7).  Torture is:

> any act, directed against an individual in the offender's custody or physical control,
> by which *severe pain or suffering* (other than pain or suffering arising only from or
> inherent in, or incidental to, lawful sanctions), whether physical or mental, is
> intentionally inflicted on that individual *for such purposes* as obtaining from that
> individual or a third person information or a confession, punishing that individual
> for an act that individual or a third person has committed or is suspected of having
> committed, intimidating or coercing that individual or a third person, or for any
> reason based on discrimination of any kind . . . .

Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, § 3(b), 106 Stat. 73, 73–

74 (1992) (codified at 28 U.S.C. § 1350 note) (emphases added).  This definition requires that the

conduct is both: 1) severe; and 2) for the purposes set forth in the definition.  *See Price v. Socialist*

*People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002).  Here, Plaintiffs have

established that Iran's treatment toward Kian in Evin Prison meets both requirements of torture.

*Severity*.  Courts evaluate severity based on "the degree of pain and suffering that the

alleged torturer intended to, and actually did, inflict upon the victim." *Id.* at 93.  Thus, the "more

intense, lasting, or heinous the agony, the more likely it is to be torture." *Id.*  A single instance of

excessive force used against a prisoner, for example, may not be torture.  *See id.*  Rather, the

conduct must be "sufficiently extreme and outrageous to warrant the universal condemnation that

the term 'torture' both connotes and invokes." *Simpson v. Socialist People's Libyan Arab*

*Jamahiriya* ("*Simpson I*"), 326 F.3d 230, 234 (D.C. Cir. 2003) (quoting *Price*, 294 F.3d at 92)

(holding that plaintiff did not experience torture when she was interrogated, threatened with death,

and forcibly separated from her husband because those acts were not "so unusually cruel or

sufficiently extreme and outrageous as to constitute torture within the meaning of the Act"). Applying these principles, courts have frequently found that Iran's treatment of certain prisoners constitutes torture. *See, e.g.*, *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 60–62, 68 (D.D.C. 2015) (collecting cases and concluding plaintiff endured torture in Iranian prison from frequent threats of death and dismemberment, physical beatings, sexual assault and being held in "excruciatingly painful positions for hours at a time during the interrogations"); *Hekmati*, 278 F. Supp. 3d at 160–61 (collecting cases and concluding that the "physical and mental injuries inflicted upon Hekmati by his interrogators in conjunction with the other conditions of his detention constituted torture").

Here, Plaintiffs have sufficiently established severity under the statute for Kian's periods of imprisonment in Evin Prison, but not for his time on furlough in home confinement. In Evin Prison, Kian suffered extensively due to his interrogations, living conditions, and sham trials. Like in *Moradi* and *Hekmati*, the physical and mental injuries inflicted upon Kian were sufficiently extreme and outrageous. *See Moradi*, 77 F. Supp. 3d at 68; *Hekmati*, 278 F. Supp. 3d at 160–61. Kian endured daily interrogations, where he was constantly punished. ECF No. 27-5 ¶¶ 16, 19. And he was threatened with life imprisonment or execution. *Id.* ¶ 16; *see also id.* ¶ 38 ("During the interrogation, in which I continued to deny being an American spy, I was told that I had committed the crime of treason and would have to pay dearly for that."). The treatment against Kian went well beyond excessive force used against a prisoner. *See Price*, 294 F.3d at 93. Nor could it be fairly characterized merely as aggressive questioning on the part of law enforcement. For example, Kian once "was forced to face one of the walls with the metal chains and rings as [his] interrogators asked [him] questions." ECF No. 27-5 ¶ 37.

Beyond the interrogations, the extended periods of solitary confinement caused Kian

severe physical and mental suffering. *Id.*¶¶ 14, 35, 50–51.[5] Kian also faced sham trials during which he feared the death penalty was likely. *Id.* ¶¶ 40–47. As a result of this treatment, Kian experienced extreme mental anguish. ██████████████████████████████████████ ██████████████████████████████████████████████ Based on the totality of Kian's treatment, it is clear that Iranian officials intended to and did inflict intense, lasting, and heinous pain and suffering on Kian. *See Price*, 294 F.3d at 93.

In home confinement, Kian feared for his life and experienced "unrelenting" depression, humiliation, and anxiety. ECF No. 27-5 ¶¶ 56–57. Officials surveilled, threatened, and forced him to visit a warehouse where officials dictated his activities. *Id.* ¶¶ 53–57. Kian certainly endured abuse, but it does not appear that that abuse rose to the level of torture as it is defined under the TVPA. *See, e.g.*, *Kar v. Islamic Republic of Iran*, Nos. 19-cv-2070, 19-cv-2602, 2022 WL 4598671, at *11 (D.D.C. Sep. 30, 2022) (concluding Iran's constant control over individual during home confinement, though abusive, did not "pass the high bar for identifying torture"). Because Kian's home confinement did not meet the legal definition of "severe," it is unnecessary to consider whether those acts were purposeful.

*Purposefulness.* To constitute torture, the act must be conducted "*for such purposes*" that include punishment, intimidation, coercion, or obtaining a confession. TVPA § 3(b) (emphasis added). As this Circuit has explained, the statute's list of purposes reinforces "that torture requires acts both intentional and malicious." *Price*, 294 F.3d at 93. This means that the foreign state "must impose suffering cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end." *Id.* For example, mistreatment is purposeful if the torturer

---

[5]    Solitary confinement alone may not constitute torture, but the Court "need not reach that novel issue given its conclusion that the totality of [Kian's] treatment constituted torture." *Hekmati*, 278 F. Supp. 3d at 161 n.10 (citing *Moradi*, 77 F. Supp. 3d at 68 n.9).

"targeted the victim . . . to punish him for his religious or political beliefs." *Han Kim*, 774 F.3d at 1050 (holding North Korea targeted victim because of his humanitarian activities and identity as a Christian missionary who proselytized to defectors).

In light of the evidence, Iran's treatment toward Kian in Evin Prison was plainly intentional and for political purposes. Kian testified that his interrogators repeatedly tried to elicit false confessions that he was an American spy. *See* ECF No. 27-5 ¶ 33 ("I was asked to confess to being an American spy trying to overthrow the Iranian government through the Green Movement."). Prosecutors charged Kian (who was later convicted in a sham trial) with espionage without any credible evidence to support those charges. *Id.* ¶ 41; *see also* ECF No. 27-7 ¶¶ 28–29. Plaintiffs' expert witness bolsters the conclusion that Iran targeted Kian for political reasons. The expert explained that Iran's treatment of Kian was part of a broader pattern and practice targeting U.S.-Iranian dual citizens to give Iran leverage against the United States. ECF No. 27-7 ¶¶ 15–16. Further, Iran's objectives were: 1) to intimidate an Iranian academic for having Western contact; 2) to prevent the Iranian diaspora from returning to their homeland; and 3) to marginalize "reformist elite[s]" who aspire to normalize U.S.-Iran relations. *Id.* ¶ 34. In short, Iranian officials sought to elicit false confessions, intimidate and punish Kian for his American ties, and gain leverage against the United States. Plaintiffs have submitted satisfactory evidence to show that the treatment toward Kian was "purposeful" to qualify as torture under the statute.

### 2. Hostage Taking

Because Plaintiffs have shown that the treatment that Kian endured amounted to torture, Plaintiffs have established subject matter jurisdiction through the terrorism exception. Plaintiffs have also met their burden for the independent reason that Iran's treatment also qualifies as hostage taking.

The FSIA incorporates the definition of hostage taking from the International Convention Against the Taking of Hostages.  28 U.S.C. § 1605A(h)(2).  The Convention states that:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of a hostage commits the offense of taking of hostages.

International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, T.I.A.S. No. 11081, 1316 U.N.T.S. 205.

Courts have construed this definition to require: 1) an abduction or detention; and 2) the defendant's intended purpose of accomplishing "the sort of third-party compulsion described in the [C]onvention." *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 135 (D.D.C. 2021) (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya* ("*Simpson II*"), 470 F.3d 356, 359 (D.C. Cir. 2006)).  Plaintiffs have established the two elements of hostage taking.

*Abduction or detention.*  An abduction or detention involves "physical capture and confinement." *Mohammadi*, 782 F.3d at 16.  The definition of hostage taking does not include, for example, "a prohibition on international travel . . . because it does not amount to 'seizure' or 'detention' under any ordinary understanding of those terms." *Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338, 1342 (D.C. Cir. 2021) (internal quotation marks omitted) (citing *Mohammadi*, 782 F.3d at 16).  Iran clearly subjected Kian to "physical capture and confinement" in Evin Prison. *Mohammadi*, 782 F.3d at 16.

It is a closer question whether the time Kian spent on furlough amounts to a "detention" under the ordinary understanding of that term. *See Radmanesh*, 6 F.4th at 1342.  Two cases on hostage taking are instructive.  In *Kar v. Islamic Republic of Iran*, the court concluded that Iran "detained" a journalist Siamak Pourzand ("Siamak") in home confinement following his release from Evin Prison. *See* 2022 WL 4598671 at *8.  Based on the evidence, the court found that

16

Siamak: 1) was "still under continued detention and surveillance"; 2) had to constantly report his communications and whereabouts to his prosecutors and interrogators; and 3) continued to "live under the constant threat of being returned to Evin to serve out his term." *Id.* (citations omitted). As the court noted, Siamak "remained under Iran's control even though he had some limited freedom." *Id.*

By contrast, in *Radmanesh v. Government of Islamic Republic of Iran*, the court found the plaintiff failed to establish hostage taking based merely on the requirement that the plaintiff's mother report the plaintiff's whereabouts to the Iranian government. *See* No. 17-cv-1708, 2019 WL 4169822, at * 6–7 (D.D.C. Sep. 3, 2019), *aff'd*, 6 F.4th 1338 ("Satisfying such a reporting requirement hardly amounts to house arrest or detention, and it is certainly not a hostage taking.").[6] Although the plaintiff argued that he was subjected to "house arrest," the court stated the allegations "do not describe conditions that rise to the level of pervasive custodial control generally contemplated by the phrases 'house arrest' or 'home confinement.'" *Id.* at *6. The plaintiff failed to allege "pervasive surveillance equivalent to electronic monitoring, phone checks, or unscheduled house visits." *Id.* Nor did he allege that he had to request permission to leave his house or that he was subject to any restrictions on his travel within the country. *See id.*

Kian's period of home confinement amounts to a "detention" under the hostage taking definition. Like in *Kar*, the facts reflect that Kian was fully under the control of the government. *See* 2022 WL 4598671 at *8. Specifically, Kian could not leave his house or go anywhere without his interrogators' permission. ECF No. 27-5 ¶ 57. Nor could anyone visit him without permission.

---

[6]     The Circuit affirmed the district court's decision denying default judgment based on the plaintiff's original theory that "he was taken hostage when forced to remain in Iran in order to compel his father to train engineers." *Radmanesh*, 6 F.4th at 1342. Because the plaintiff did not challenge on appeal the district court's subsequent ruling with respect to the alleged house arrest, the Circuit declined to address that ruling. *See id.* at 1342 n.2.

*Id.* And unlike in *Radmanesh*, Kian has established that he was subjected to pervasive custodial control. *See* 2019 WL 4169822, at *6–7. Kian's interrogators stated they would watch Kian at all times. *See* ECF No. 27-5 ¶ 54 (recounting instructions from officials that "I wouldn't be able to drink a glass of water in my home without them knowing"). They installed hidden cameras and microphones throughout Kian's house. *See id.* ¶ 57 ("I knew this to be true because my interrogators would often repeat back to me things that had only been said in my house."). They regularly brought Kian to a warehouse and threatened him to comply with their directions. *Id.* ¶¶ 55–56 ("My interrogators told me that the consequences for failing to follow their directions would be dire. Fearing for my life, I complied with their demands."). In sum, Kian remained in Iran's detention during this period.

*Defendant's intended purpose.* A detention constitutes "hostage taking" when the defendant's purpose was to compel some result from a third party in exchange for the detainee's freedom. *See Price*, 294 F.3d at 94. In other words, there must be a "demand for *quid pro quo* terms between the government . . . and a third party whereby [the victims] would have been released." *Id.* The third-party's awareness of the hostage taking is not required. *Simpson II*, 470 F.3d at 360–61. A plaintiff must establish a nexus between the hostage taking and any concrete concession that the defendant may have hoped to extract. *See id.* (citation omitted). For example, "[p]olitical leverage in the context of a country's relationship with the United States is a sufficiently coercive purpose to establish hostage-taking." *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 46–47 (D.D.C. 2019); *see, e.g.*, *Rezaian*, 422 F. Supp. 3d at 176 (finding Iran's arrest of dual U.S.-Iranian citizen with "goal of compelling the United States to free Iranian prisoners as condition of [the plaintiff's] release" satisfied definition).

Plaintiffs have sufficiently shown that Iran arrested Kian to gain leverage over the United

States by, among other things, detaining dual citizens. *See supra* Analysis § II.C.1. The fact that Iran ultimately released Kian from home confinement in a prisoner exchange further underscores the clear nexus between Iran's hostage taking of Kian and the concessions it desired from the United States. ECF No. 27-5 ¶ 61; *see Simpson II*, 470 F.3d at 360–61.

Based on the foregoing, Plaintiffs have submitted satisfactory evidence to establish that Iran has waived its sovereign immunity pursuant to the terrorism exception through both torture and hostage taking. Accordingly, the Court may properly exercise subject matter jurisdiction over this case.

### III.    Personal Jurisdiction

Even where a plaintiff establishes subject matter jurisdiction under an exception to the FSIA, they must still show that the court has personal jurisdiction over the sovereign. The Court has personal jurisdiction over a foreign state that has been properly served under 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). Section 1608 provides four methods of service in descending order of preference. *See Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015). The available methods are:

> 1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> 2) . . . in accordance with an applicable international convention on service of judicial documents; or
>
> 3) . . . by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or
>
> 4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to

> be addressed and dispatched by the clerk of the court to the Secretary
> of State in Washington, District of Columbia, to the attention of the
> Director of Special Consular Services—and the Secretary shall
> transmit one copy of the papers through diplomatic channels to the
> foreign state and shall send to the clerk of the court a certified copy
> of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). Where, as here, the first two methods are unavailable, a plaintiff may send the summons, complaint, and notice of suit, plus translations of each, to the Clerk of the Court to send to the head of the ministry of foreign affairs. *Id.* § 1608(a)(3). If a plaintiff cannot effectuate service after thirty days, then they may send those documents to the Clerk to send to State Department. *Id.* § 1608(a)(4).

Plaintiffs have properly served Iran. ECF No. 27-4 at 29. Plaintiffs were unsuccessful in serving the head of the Ministry of Foreign Affairs of Iran. ECF Nos. 19; 20. Plaintiffs then attempted to serve Iran through diplomatic channels. ECF No. 22. Plaintiffs sent two copies of the summons, Complaint, notice of suit, and Offer to Arbitrate, along with Farsi translations, to the Clerk of the Court. ECF Nos. 16; 17. The Clerk forwarded those documents to the State Department. ECF No. 18. The Embassy of Switzerland delivered the documents to the Iranian Ministry of Foreign Affairs, which refused the documents. ECF No. 22. Plaintiffs accordingly met the requirements for service under the fourth method. *See* 28 U.S.C. § 1608(a)(4); *see, e.g.*, *Hekmati*, 278 F. Supp. 3d at 156, 162 (finding personal jurisdiction where plaintiff served Iran under fourth method through State Department and Swiss Embassy).

### IV.    Iran's Liability

Having established that the Court has jurisdiction over this case, the next question is whether Plaintiffs have proved their claims with satisfactory evidence. *See* 28 U.S.C. §§ 1605A(c), 1608(e). Plaintiffs bring five claims. ECF No. 1. Although they have failed to establish liability for Count I, they have prevailed on Counts II through V.

In Count I, Kian asserts a claim under Section 1605A(a) for torture and hostage taking. *Id.* ¶¶ 47–58. Section 1605A(a) is, however, an immunity-stripping provision, not a liability provision. 28 U.S.C. § 1605A(a)(1); *cf. Est. of Fouty v. Syrian Arab Republic*, 743 F. Supp. 3d 118, 157 n.12 (D.D.C. 2024) (discussing difference between immunity-stripping and liability provisions). Given that Section 1605A(a)(1) does not provide a cause of action, Kian is not entitled to default judgment on Count I.

Plaintiffs have brought all remaining claims under Section 1605A(c). Specifically, Plaintiffs have asserted claims based on theories of assault and battery (Count II), intentional infliction of emotional distress ("IIED") (Count III), false imprisonment (Count IV), and third-party IIED/loss of solatium (Count V). ECF No. 1 ¶¶ 59–74. Section 1605A(c) sets forth a private right of action. 28 U.S.C. § 1605A(c). Because the statute provides a broad reference to liability for personal injury or death, some courts have assessed liability through general tort theory. *Id.*; *see, e.g.*, *Saberi v. Gov't of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 81–82 (D.D.C. 2021). This Circuit recently clarified, however, that courts do not need to "search outside the statute when the relevant law is the statute's plain text." *K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988, 991 n.4 (D.C. Cir. 2025). Thus, a plaintiff must establish only the relevant statutory elements: 1) the foreign state is a state sponsor of terrorism; 2) the plaintiff is a national of the United States; 3) the foreign state committed acts of torture or hostage taking; and 4) those acts caused personal injury or death. 28 U.S.C. § 1605A(c); *see K.E.F.V.*, 135 F.4th at 991.

Plaintiffs have satisfied the first three elements. *See supra* Analysis § II. Further, those acts caused personal injuries: Kian's pain and suffering from torture and hostage taking, *see supra* Analysis § II.C, and the other Plaintiffs' emotional distress. *See infra* Analysis § V.B.2.

Accordingly, Plaintiffs have established Iran's liability under Counts II–V. The only remaining question is damages.

## V.    Damages

Under the terrorism exception, prevailing plaintiffs may recover "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Damages are available if the consequences of the defendant's tortious acts are "reasonably certain," which means more likely than not to occur. *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003). Plaintiffs must prove damages by a "reasonable estimate." *Id.* (quoting *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997)). Plaintiffs request damages for Kian's past and future pain and suffering and for Farideh G., Cyrus, and Farideh M.'s loss of solatium. ECF Nos. 1 at 15; 27-4 at 42–45. Plaintiffs also seek punitive damages.[7] ECF Nos. 1 at 15; 27-4 at 45–49. As discussed below, Plaintiffs are entitled to the following damages award: $21,272,500.00 for Kian's pain and suffering; $2.5 million for Cyrus's loss of solatium; $2.5 million for Farideh G.'s loss of solatium; and $26,272,500 for punitive damages.

### A.    Pain and Suffering

Kian seeks $25,150,000 for the pain and suffering he endured during his imprisonment and $10 million for his post-captivity pain and suffering. ECF No. 27-4 at 42–44. He has established entitlement to both categories of damages but equaling a total award of **$21,272,500**.

*Damages for pain and suffering during imprisonment.* Pain and suffering are reasonably certain consequences of torture. *See Hekmati*, 278 F. Supp. 3d at 163 (collecting cases). Although

---

[7]    Plaintiffs alleged that they suffered economic damages. ECF No. 1 ¶ 72. Plaintiffs fail to advance any argument on these damages, so the Court deems any claim for economic damages waived. *Cf. Goodrich v. Teets*, 510 F. Supp. 2d 130, 143 (D.D.C. 2007) (noting courts do not ordinarily entertain arguments that a plaintiff included in a complaint but not did not raise in a motion for summary judgment).

assigning a dollar value is difficult, the primary consideration is to ensure that "individuals with similar injuries receive similar awards." *Id.* (citation omitted). This District has awarded damages for "prolonged and abusive captivity at $10,000 per day for the pain and suffering that victims experienced while imprisoned." *Id.* at 163–64 (citation modified) (collecting cases).

With respect to Kian's pain and suffering in Evin Prison, there is no reason to deviate from the standard formula of $10,000 per day. *Id.* at 164. Officials incarcerated and tortured Kian in Evin Prison for 132 days (from May 11, 2007 to September 19, 2007) and 248 days (from July 9, 2009 to March 13, 2010). ECF No. 27-5 ¶¶ 11, 22, 27, 53. Accordingly, Kian is entitled to recover **$3,800,000** for his 380 days in prison.

Kian's damages for his time on furlough, however, should be awarded a lower per diem rate. Another court in this District recently explained, "It would not be fair to equate [the plaintiff's] time under house arrest to other victims' time in prison. House arrest is much less grueling than imprisonment." *Ghodstinat v. Islamic Republic of Iran*, No. 23-cv-3175, 2025 WL 2222768, at *7 (D.D.C. Aug. 5, 2025). The court in that case awarded the plaintiffs damages of $3,500 per day of house arrest. *See id.* at *7, 10. Given the importance of granting individuals with similar injuries similar awards, this Court finds that rate appropriate here for the time Kian was on furlough. *See Hekmati*, 278 F. Supp. 3d at 163.

Two considerations support this conclusion. On the one hand, as discussed above, Iran's treatment toward Kian during this period did not amount to "torture" as defined under the TVPA. *See supra* Analysis § II.C.1. Indeed, the evidence does not reflect that Kian endured daily interrogations or suffered from the brutal living conditions that characterized his time in Evin Prison. *See Ghodstinat*, 2025 WL 2222768, at *7 (observing that the plaintiff's home conditions were much better than those he experienced at Evin Prison). On the other hand, Kian has testified

to his pain and suffering in home confinement. ECF No. 27-5 ¶ 57 ("My home became my prison during these years. My depression, fear, humiliation and anxiety was unrelenting."). Moreover, the Court has found that his home confinement amounted to a "detention" under the hostage taking definition. *See supra* Analysis § II.C.2. Kian's home confinement lasted for 2,135 days (from March 14, 2010 to January 16, 2016). *See* ECF No. 27-5 ¶¶ 53, 58. Using a per diem rate of $3,500, Kian is entitled to a total of **7,472,500** for his pain and suffering in home confinement.

 *Damages for post-captivity pain and suffering.* Courts consider the following factors when calculating this category of damages: 1) the length and severity of the plaintiff's torture and detention; 2) the extent of the plaintiff's lasting physical and mental injuries; and 3) the plaintiff's age at the time of release and estimated number of years that the plaintiff can be expected to suffer from these injuries. *See Saberi*, 541 F. Supp. 3d at 83 (citations omitted). Again, it is important that similar plaintiffs receive similar awards. *See id.* In recent opinions involving Iran's torture of individuals in Evin Prison, courts have awarded damages ranging from $5 million to $10 million for post-captivity pain and suffering. *See, e.g.*, *Khosravi v. Gov't of Islamic Republic of Iran*, No. 16-cv-02066, 2020 WL 4923495, at *6 (D.D.C. Aug. 21, 2020) ($5 million); *Azadeh*, 2018 WL 4232913, at *20 ($8,888,889); *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 137 (D.D.C. 2019) ($9,630,000); *Hekmati*, 278 F. Supp. 3d at 163–64 ($10 million); *Rezaian*, 422 F. Supp. 3d at 180 ($10 million).

 Comparing the factors here to similar cases, it is clear that a $10 million award is appropriate. Kian's length of detention (380 days in Evin Prison) exceeds that in *Azadeh* (114 days) and *Khosravi* (251 days). Although Kian spent less time in Evin Prison than the plaintiffs in *Rezaian* (544 days), *Abedini* (1,268 days), and *Hekmati* (1,602 days), Kian's lengthy period of home confinement (2,135 days) weighs in favor of a higher award. Like other plaintiffs, Kian will

continue to suffer from PTSD and depression.  *See* ECF No. 27-6 at 14–15; *see, e.g.*, *Rezaian*, 422 F. Supp. 3d at 180 (noting long-term psychological effects from plaintiff's detention). ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████  Finally, Kian was older when he was released (54 years old) and, thus, has a shorter life expectancy than the plaintiffs in *Hekmati* (32 years old), *Azadeh* (42 years old), *Abedini* (35 years old), and *Rezaian* (40 years old).  The *Khosravi* court awarded $5 million to the plaintiff who was approximately 57 years old at the time of release.  *See* 2020 WL 4923495, at *6.[8]  Compared with the plaintiff in *Khosravi*, however, Kian spent over 100 more days in Evin Prison plus years in home confinement.  On balance, Kian's post-release pain and suffering merits a **$10 million** award.

### B.    Solatium Damages

Farideh G., Cyrus, and Farideh M. seek $4 million each in solatium damages to account for the emotional distress they experienced due to Iran's imprisonment and torture of Kian.  ECF No. 27-4 at 40–41, 45.  As discussed below, Kian's biological parents, Farideh G. and Cyrus, are eligible to recover **$2.5 million each**.  Kian's stepmother Farideh M. is not eligible for this measure of damages.

### 1.    Legal Standard

Courts may "rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)."  *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018).  To evaluate

---

[8]    That plaintiff was born in 1959 and released from Evin Prison in 2016.  *See* Decl. of Farzad Khosravi, *Khosravi v. Gov't of the Islamic Republic of Iran*, No. 16-cv-2066 (D.D.C. June 11, 2018), ECF No. 12-2 ¶¶ 1, 33.

solatium damages, courts consider two factors: 1) the "injury to the feelings" of the family member; and 2) the loss of the victim's "comfort and society." *K.E.F.V.*, 135 F.4th at 992 (quoting *Fraenkel*, 892 F.3d at 356).

Courts have assessed solatium damages using the framework for third-party IIED claims. *See Fraenkel*, 892 F.3d at 357 (noting "a claim for solatium" is "nearly indistinguishable from a claim for intentional infliction of emotional distress" (internal quotation marks omitted) (quoting *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015))). The elements are: 1) extreme and outrageous conduct directed at a victim; 2) that intentionally or recklessly caused severe emotional distress; 3) to the victim's immediate family member.[9] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 78–79 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(2)(a) (A.L.I. 1965)).

For the third requirement, courts have "adopted the strict meaning of immediate family, defined as one's spouse, parents, siblings, and children." *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 62 (D.D.C. 2018) (citation modified). This Circuit has recognized that in limited circumstances relatives who are "the functional equivalents of immediate family members" may recover in this context. *Bettis*, 315 F.3d at 337. This may include a relative who resided in the victim's household or who was the victim's legal guardian. *Id.*; *see, e.g.*, *Valore*, 700 F. Supp. 2d at 79–80 (finding stepfather was functional equivalent of a father because stepfather treated victim as his son and victim grew up with stepfather). On the other hand, merely claiming a close

---

[9] The Restatement (Second) of Torts states that a third-party plaintiff must also establish that she was present at the time of the extreme and outrageous conduct. *See* Restatement (Second) of Torts § 46(2)(a) (A.L.I. 1965). Courts have, however, consistently found that third-party plaintiffs need not be present to prevail under the FSIA because acts of torture and hostage taking are so extreme and outrageous. *See, e.g.*, *Est. of Heiser*, 659 F. Supp. 2d at 27–28 (collecting cases and extending "suspension of the presence requirement to terrorism cases generally").

relationship is not enough. *See Bettis*, 315 F.3d at 337; *see, e.g.*, *Fritz*, 324 F. Supp. 3d at 63 n.1 (noting it is unlikely that a half-sibling could be the functional equivalent of a sibling if the half-sibling was an adult when the half-sibling met the victim and the two did not live in the same household for extended periods of time).

To calculate damages, many courts have followed the framework from *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006). *See Fraenkel*, 892 F.3d at 361. Although the *Heiser* framework is not mandatory, *see id.*, courts often apply it to provide similar awards to similar plaintiffs. *See, e.g.*, *Kar*, 2022 WL 4598671, at *18–19. In terrorism cases in which "the victim does not die, but instead suffers only injury, the following benchmarks apply: spouses receive $4 million, while children and parents receive $2.5 million each." *Wang v. Islamic Republic of Iran*, No. 22-cv-583, 2025 WL 785736, at *14 (D.D.C. Mar. 12, 2025) (citation modified).

### 2.    Discussion

*Immediate family requirement.* Farideh G. and Cyrus are immediate family. Because Farideh M. is Kian's non-adoptive stepmother, she must be the functional equivalent of Kian's mother to prevail. *See Bettis*, 315 F.3d at 336–37.

Although a close question, Plaintiffs have failed to establish that Farideh M. meets this definition. First, nowhere in the record is it clear that Farideh M. ever "*resided in the same household* with" Kian. *Id.* at 337. Kian temporarily stayed with Cyrus and Farideh M. immediately after his release, but soon moved away to restart his job. *See* ECF Nos. 27-5 ¶ 62; 27-9 ¶ 15. Second, Farideh M. was never Kian's legal guardian, as Kian was twenty-six when Farideh M. married Cyrus. *See Bettis*, 315 F.3d at 337; ECF No. 27-10 ¶¶ 3–4. In cases where courts have found a non-adoptive stepparent to be the functional equivalent of a parent, the

stepparent lived with the stepchild when he was a minor. *See, e.g.*, *Est. of Heiser*, 659 F. Supp. 2d at 29 (noting stepfathers lived with stepsons while they were still minors and treated them as their own sons). Even though it is apparent that Farideh M. enjoys a strong relationship with her stepson, Plaintiffs have failed to overcome the strict standard that the law requires.

*Other elements of an IIED claim.* Farideh G. and Cyrus, the remaining plaintiffs, have established an IIED claim to be eligible for solatium damages. First, Iran's torture and hostage taking conduct toward Kian constitutes extreme and outrageous conduct intended to cause severe emotional distress. Indeed, acts of terrorism are "by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Valore*, 700 F. Supp. 2d at 77 (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)). Second, Farideh G. and Cyrus have established through sworn affidavits that they suffered severe emotional distress. After visiting Kian in prison, Cyrus was "extremely disturbed and upset" and "feared for [Kian's] life and future." ECF No. 27-9 ¶ 23. Cyrus "personally fell strangely sick," which a doctor later diagnosed as high blood pressure. *Id.* ¶ 24. Farideh G. testified that her "days are passing through the horror tunnel of life, reimagining the prison visits, and horrible humiliating process we had to go through in that filthy smelly place." ECF No. 27-8 ¶ 17. She "cannot stop crying after all these years," suffers nightmares about seeing Kian harmed, and, despite therapy, has "lost [her] sense of equilibrium and peace of mind." *Id.* ¶¶ 18–20.

*Heiser framework.* Plaintiffs agree that the *Heiser* framework is appropriate. ECF No. 27-4 at 45. Their requests for $4 million appear to be a typographical error. Under *Heiser*, Farideh G. and Cyrus are each entitled to $2.5 million.

### C.    Punitive Damages

Plaintiffs seek punitive damages for $5 billion, or alternatively for $47,150,000 in an amount equal to compensatory damages. ECF No. 27-4 at 49. Plaintiffs may recover punitive damages equal to compensatory damages, which is **<u>$26,272,500</u>**.

The FSIA expressly permits punitive damages for claims falling under the terrorism exception. 28 U.S.C. § 1605A(c); *see Opati*, 590 U.S. at 422–23. The purpose of these damages is to punish and deter outrageous conduct. *See Hekmati*, 278 F. Supp. 3d at 166 (citing Restatement (Second) of Torts § 908(1) (A.L.I. 1965)). Courts consider various factors in determining whether to award punitive damages: "the character of the defendant's act; the nature and extent of harm to the plaintiff that the defendant caused or intended to cause; the need for deterrence; and the wealth of the defendant." *Abedini*, 422 F. Supp. 3d at 141 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 32 (D.D.C. 1998)). Courts have frequently awarded punitive damages for Iran's imprisonment of U.S. citizens in Evin Prison. Although multiple calculation methods are available, the majority of courts to consider the question has awarded an amount equal to compensatory damages. *See id.* (collecting cases); *see, e.g.*, *Wang*, 2025 WL 785736, at *16; *Hekmati*, 278 F. Supp. 3d at 166–67; *Saberi*, 541 F. Supp. 3d at 87.

Punitive damages are appropriate in this case based on four relevant considerations. First, the character of the defendant's act weighs in favor of punitive damages because hostage taking and torture are "the quintessential embodiment of outrageousness." *Abedini*, 422 F. Supp. 3d at 141 (citation omitted). Second, the nature and extent of the harm supports damages as Kian experienced harm that is "substantial and permanent." *Id.* (quoting *Hekmati*, 278 F. Supp. 3d at 166). Third, damages support the need to deter Iran, which has a record of taking U.S.-Iranian dual citizens hostage to advance a political agenda. ECF No. 27-7 at 16–17; *see Hekmati*, 278 F. Supp. 3d at 166. Finally, the wealth of Iran is relevant: Iran's GDP is approximately $1.6 trillion.

*See Index of Economic Freedom: Iran* (Feb. 2025), Heritage Found., https://www.heritage.org/index/pages/country-pages/iran [https://perma.cc/AA3P-NL7H] (last visited Aug. 13, 2025).

Plaintiffs are entitled to an amount of punitive damages equal to compensatory damages. Although Plaintiffs request a multiplier amount of up to $5 billion, Plaintiffs have not asserted any persuasive reason to depart from the majority of courts in these cases.

In sum, Plaintiffs may recover the following amounts: $21,272,500 for Kian's pain and suffering; $2.5 million for Cyrus's loss of solatium; $2.5 million for Farideh G.'s loss of solatium; and $26,272,500 for punitive damages. The total award is **$52,545,000**.

## CONCLUSION

For the foregoing reasons, this Court recommends that Plaintiffs' Motion be **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED.**

Date:   August 13, 2025

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

## <u>REVIEW BY THE DISTRICT COURT</u>

The Parties are hereby advised that under Local Civil Rule 72.3(b), any party who objects to the proposed findings or recommendations herein must file written objections within fourteen days of being served with a copy of the Report and Recommendation. Objections must specifically identify the portion of the recommendation to which the objection pertains and the basis for the objection. The Parties are further advised that they may waive their right of appeal from an order of the District Court adopting such findings and recommendations if the Parties fail to file timely objections to the findings and recommendation set forth in this Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985).

\* \* \*